IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs April 28, 2020

**STANLEY BLAIR HILL v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Blount County**
**No. C-22929 David Reed Duggan, Judge**

_____

**No. E2018-02080-CCA-R3-PC**

_____

The Petitioner, Stanley Blair Hill, filed for post-conviction relief from his conviction of first degree murder, alleging that his trial counsel were ineffective. The post-conviction court denied relief, and the Petitioner appeals, contending that counsel were ineffective by failing "to obtain adequate expert and investigative assistance and/or to present such testimony at trial"; by failing "to object to the introduction of improper, irrelevant, inflammatory and prejudicial evidence"; and by failing to adequately advise the Petitioner whether to accept or reject the State's plea offer. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which TIMOTHY L. EASTER and J. ROSS DYER, JJ., joined.

Randall E. Reagan and Douglas A. Trant, Knoxville, Tennessee, for the Appellant, Stanley Blair Hill.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Michael L. Flynn, District Attorney General; and Tammy M. Harrington, Tracy Jenkins, and Robert Headrick, Assistant District Attorneys General, for the Appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

The Petitioner was convicted by a Blount County Jury of committing the first degree premeditated murder of his wife, Vickie Hill, on the morning of December 31, 2003, and received a life sentence for the conviction. State v. Stanley B. Hill, No. E2012-00289-

CCA-R3-CD, 2013 WL 4715115, at *1 (Tenn. Crim. App. at Knoxville, Aug. 30, 2013). This court summarized the facts adduced at trial as follows:

> [T]he first officer who responded to the [Petitioner's] 911 call was met in the driveway by the [Petitioner], who informed him that he had gotten up that morning, looked for the victim, and found her in the garage, where she had hanged herself. The [Petitioner] told the officer that the victim had attempted suicide about a year earlier by taking an overdose of her anti-depressant medication but that she had not mentioned suicide recently. . . . The initial story the [Petitioner] gave of having laid the victim on her back on the garage floor after cutting her loose from the rope was inconsistent with the physical evidence, which, among other things, included sawdust on the front of the victim's pants, dirt and debris on the front part of her feet, a rectangular pattern impression on her stomach that matched the pattern of a pile of flooring materials in the garage, and two ligature marks on her neck. One of those two marks was shallow and went up, consistent with the mark left on a body that has been hanged, while the other one was deep and went straight back, inconsistent with a hanging. Investigators, therefore, ordered an autopsy on the victim and transported the [Petitioner] to the sheriff's department for questioning.
>
> The [Petitioner] initially repeated his story of the victim's having committed suicide in the garage. He changed his story, however, after the investigators informed him that the autopsy showed that the victim was already dead at the time her body was hanged. In his new version, the [Petitioner] said that the victim wanted to commit suicide but was afraid that she would botch the job if she tried alone, so she asked him to help her prepare and execute the plan. He said she repeatedly begged for his help before he finally relented and devised a method for her to hang herself with a rope by rolling off the double bed in the bedroom of her older son, who was away from home at the time the victim ultimately chose to commit suicide. The [Petitioner] stated that the victim told him she would start "kicking and fighting" during the suicide and made him promise not to let her get up. She also made him promise to stage the scene in the garage because she was concerned

about what would happen to their two-year-old son if the [Petitioner] was implicated in her death. . . .

The [Petitioner] stated that the victim had unsuccessfully attempted suicide at least twice in the past, that she lived on a roller coaster of emotions, that her anti-depressant medication had ceased working, and that she became tired of the roller coaster and begged him to help her end her life because she was convinced that she was making everyone around her miserable. The [Petitioner] said that the previous night the victim announced that it was time to execute the suicide plan. He described what occurred:

> She said that last night was the night. She said that, uh, she didn't want to go on anymore. She didn't want to make anybody else miserable. She wanted me to set the rope up. All it was, was a loop that went around the bottom of the bed. And it had another loop and, uh, through that loop, you could twine the rest of the rope to make the noose. And then it had a long end on it. The long end was tied up. And what she did, she just rolled off the bed, which, uh, tightened the noose, left her head about that far off the ground, maybe. And, uh, when she started kicking and screaming, I promised her that I would do it, and I did.
>
> [Detective]: What did you do?
>
> [Petitioner]: I just—I just held her down.

The [Petitioner] stated that he straddled the victim, holding one hand on her chest and another on her side, to prevent her from aborting her suicide. When asked how long he had to hold her down before she died, he replied:

> It seemed like forever. I don't know. I couldn't—I don't know whether it was a minute, it was five minutes, one minute, three minutes. It just seemed like forever. When she stopped . .

. kicking and she was moving her arms, I kind of let go and she was able to release herself and some air come up. And it scared me, and I went back down again. I held it for another minute and I realized that was just the air escaping her. It was already over. And she was finally at peace. She was where she wanted to be.

. . . .

The [Petitioner] stated that the victim had planned her suicide for two months and that he had worked for three or four weeks to devise the rope system that she used to execute it. He stated that the victim wanted him to devise a system that she could implement alone, but he was unable to do so. He said that he did not tell the investigators the truth when they first arrived at his house because he was afraid that if he did, it would result in his separation from his two-year-old son, who was "[his] life."

The [Petitioner] informed the investigators that the rope the victim used to commit suicide was behind the mattress still tied to a leg of the victim's son's bed. Unknown to the [Petitioner], investigators had already discovered a yellow rope with loops and knots in it tied to the bed's leg and in the location described by the [Petitioner]. The investigators bagged that piece of rope as evidence and asked the [Petitioner] to partially reenact the alleged assisted suicide using a different rope supplied by them and with a female officer playing the role of the victim. The lengthy videotape of the reenactment, which took place in the victim's son's bedroom, was played for the jury at the [Petitioner's] trial and admitted as an exhibit in the case. After the reenactment, investigators took the [Petitioner] back to the sheriff's department where they conducted a third interview. In the final interview, the [Petitioner] denied that he ever hit the victim before her death. He acknowledged that he and the victim had marital problems and that she had threatened divorce after the birth of their son but denied that she had mentioned divorce recently. He acknowledged that the victim had repeatedly insulted him and that he was angry and "fed up" with her behavior on the night

- 4 -

of her suicide, which was one of the reasons he ultimately agreed to help her:

> I guess I was somewhat agitated at the way she treated me that . . . last night. I don't even know what day it is. Night before last. She said that that was the time and that it was going to happen. And, uh, I was upset and I was angry, and I was just tired of it, I guess. I—she had talked about it for so long, I was tired of talking about it. I mean, if you want something that bad and there's no talking you out of it—I mean, I guess I was just fed up.

The [Petitioner's] claim that the victim had not recently threatened divorce was contradicted by testimony of the victim's mother, who said the victim told her in October 2003 that she wanted to get a divorce and that, after the victim's death, she had found in the [Petitioner's] bathroom an undated handwritten letter in which the victim told the [Petitioner] that she no longer loved him and wanted a divorce. The victim's mother additionally testified that it would have been against the victim's religious beliefs to commit suicide, that the victim had never been suicidal, and that the victim had appeared normal and had been making plans for the future when she last saw her the day before her death. Corroborating evidence of the victim's having made plans for the future included evidence that she had purchased furniture on layaway on December 26, 2003, and on November 1, 2003, had signed a lease with an antique mall that did not expire until February 2004.

In addition to the above evidence, the jury heard testimony from one of the investigators that the [Petitioner] had disappeared from his parents' home on November 20, 2005, less than a month before his trial was originally scheduled to begin, and been arrested in Los Angeles on July 3, 2006, in possession of a book entitled How to Change Your Identity and Erase Bad Credit, as well as two identification cards both bearing the [Petitioner's] photograph, one of the cards supposedly from Louisiana in the name of Shawn Ashton

Myers and the other from Missouri bearing the name James Robert Reddy. Also, the [Petitioner] had social security cards in the names of James Ronnie Kemp and Benjamin R. Doolittle and a credit card in the name of Keith McKeyton.

Additional witnesses called by the State to refute the [Petitioner's] assisted suicide claim included the victim's primary care physician, the victim's gynecologist, the victim's co-worker and friend, and the victim's brother. The primary care physician testified that he had treated the victim for several years for chronic depression and prescribed various antidepressants, but she never expressed any suicidal ideation and reported on her last visit on December 10, 2003, that "things were going great." The victim's gynecologist, similarly, testified that the victim never appeared severely depressed or suicidal to her, including during the last time that she saw the victim, which was on December 16, 2003, two weeks before the victim's death. On that date, the victim, a hairdresser, cut the gynecologist's hair. The victim's friend and co-worker testified that the victim told her in October 2003 that she was contemplating divorce, that the victim told her about a month before the victim's death that she had written a letter to the [Petitioner] telling him of her desire for a divorce, and that the victim, in the weeks before her death, had begun circling apartment advertisements in the newspaper. The victim's brother testified that approximately two weeks before her death the victim asked him to be on the lookout for affordable property for her to buy because she planned to leave the [Petitioner]. He said that when he saw her on Christmas Day, the victim reminded him of her request.

The State's final witness was the Knox County medical examiner who performed the autopsy of the victim's body[, Dr. Darinka Mileusnic]. She testified that the cause of death was ligature strangulation, rather than hanging, and that the victim's lethal injuries could not have been inflicted by the assisted suicide device as demonstrated by the [Petitioner] in the reenactment videotape. The medical examiner also testified about the victim's various non-lethal injuries, including premortem blunt force trauma to the head. Over the objection of the [Petitioner], the medical examiner used a bed

brought into the courtroom and the rope that had been found in the [Petitioner's] residence to demonstrate that the rope was too short for the victim to have been hanged from the bed and that the device would not have produced the lethal strangulation ligature mark she found on the victim's neck.

The [Petitioner] presented two witnesses in his defense: a clinical psychologist and himself. The psychologist testified that her research revealed that only fifteen to twenty-five percent of the people who commit suicide in the United States leave a suicide note and that men are more likely to leave a note than women. In his testimony, the [Petitioner] essentially repeated what he told the investigators about the victim's volatile emotional health, worsening depression, previous unsuccessful suicide attempts, pleas with him to assist her with her suicide, and his role in devising the rope system and holding her down on the morning she chose to execute her plan. He denied that he hit or assaulted her or that he and the victim had any kind of physical or verbal fight on the day of her suicide. He stated that he fled the jurisdiction before his original trial was scheduled to begin because he was "scared out of [his] mind," and "felt totally helpless" because the officers did not believe his account of what happened.

The [Petitioner] testified that the rope that the medical examiner used to perform her courtroom demonstration was in a different condition than it had been at the time of the victim's suicide because he had, after the victim's death, cut the end of it off and thrown it behind the basement ceiling tiles. He said he did not reveal that detail to his counsel or anyone else until during the trial, after watching the courtroom demonstration by the medical examiner. When asked why he had cut off the end of the rope and hidden it, he explained:

> It went back to our plan. I mean, it was [to] absolve me of any implications. When I took [the victim] down there and after I couldn't get her up on the pulley, I left her laying and I went back upstairs and I got the towels that were used. I had a knife in my pocket and I used it and I cut the end of it off, which I had used to untie that.

That would have shown that I had been there. And I took it downstairs and I threw—I had been routing some wires for surround sound speakers down in the basement. And I had pushed some ceiling tiles back. When I got to the bottom of the steps, I threw the rope up into that ceiling where the ceiling was open. And I took the towels to the laundry room and left them there. And I was basically just trying to, number one, at that time, it was my intention that she was to hang in the garage, according to what we had discussed. And it was to make the bedroom not show what had happened, I guess.

On cross-examination, the [Petitioner] was unable to say why he had not thrown the entire rope up into the ceiling instead of just cutting off an end of it. He said he did not understand why he had done a lot of things that he did, other than that he was physically, mentally, and emotionally worn out at the time and was not "thinking properly." Finally, he testified that he did not tell the detectives about the piece of rope he had thrown into the ceiling because they gave him a different rope for the reenactment and he did "not think about the rope" that he had actually used for his wife's assisted suicide.

Prior to the [Petitioner's] presentation of his proof, defense counsel, to whom the [Petitioner] had just revealed that he had cut off a piece of the rope and hidden it in the ceiling tiles, received permission from the trial court to go to the [Petitioner's] former home to search for the piece of rope. At the court's direction, three law enforcement officers accompanied one of defense counsel to the residence, obtained consent from the current homeowner, and discovered a piece of yellow rope in the basement ceiling in the location indicated by the [Petitioner]. After the [Petitioner] concluded his testimony, the State moved to exclude the evidence on the basis that the [Petitioner] had not disclosed it as part of reciprocal discovery. The trial court sustained the State's motion but allowed the [Petitioner] to put on an offer of proof, which consisted of testimony by Detective Sergeant Shannon

Carswell of the Blount Count Sheriff's Department about her discovery in the basement ceiling tiles of the home an approximately four foot long length of yellow rope that was similar in appearance to the rope that had been found in the victim's son's bedroom.

Following deliberations, the jury convicted the [Petitioner] of the premeditated first degree murder of the victim, and the trial court sentenced him to life imprisonment.

Id. at *1-6.

Thereafter, the Petitioner filed for post-conviction relief, alleging that his trial counsel were ineffective by failing to obtain expert and investigative assistance; failing to object to improper, irrelevant, inflammatory, and prejudicial testimony; and failing to properly advise the Petitioner regarding whether he should accept or reject the State's plea offer. The Petitioner testified at the post-conviction hearing that he originally was represented by two retained attorneys, pretrial counsel and co-counsel. They met with the Petitioner and his family and advised him that the State had made an offer to allow the Petitioner to plead guilty to second degree murder with a sentence of twenty years and release eligibility after serving eighty-five percent of the sentence in confinement. According to the Petitioner, pretrial counsel gave no advice to the Petitioner regarding whether he should accept the offer and left the decision completely up to the Petitioner. The Petitioner told pretrial counsel that he would accept a plea to manslaughter with a sentence of fifteen years with release eligibility after serving thirty percent of the sentence in confinement. The Petitioner did not recall whether pretrial counsel told him about the State's response to the counter-offer, and the Petitioner had no further plea discussions with pretrial counsel.

The Petitioner and pretrial counsel discussed the possibility of hiring expert witnesses, including Dr. Cleland Blake, a forensic anthropologist, and Dr. Diana McCoy, a clinical psychologist. They never discussed the possibility of hiring a crime scene reconstructionist.

The Petitioner agreed that after he was released on bond, he left the jurisdiction and "stayed gone for some period of time."[1] While he was gone, pretrial counsel passed away. After the Petitioner's return, pretrial counsel's son began representing the Petitioner. The Petitioner did not see trial counsel much at first, but as the trial date drew closer, they met

---

[1] The record reflects that the Petitioner disappeared on November 20, 2005, and was arrested in Los Angeles on July 7, 2006.

almost nightly. The Petitioner did not ask trial counsel to negotiate a plea because the Petitioner thought "it was just not an option at the time." Co-counsel also continued to represent the Petitioner, but the Petitioner did not see him except at trial.

The Petitioner said that shortly after the victim's death, the police recorded an interview with him. At the beginning of the interview, the police were "extremely nice," but "at the end they were extremely rude and yelling in [the Petitioner's] face." The Petitioner could not remember specifically what the police had said. The Petitioner said that trial counsel and co-counsel told the Petitioner that they did not want the entire "twelve-plus hours" of the recording to be played at trial because they feared the jury would get bored. The Petitioner acknowledged that part of the recording was played for the jury but complained that "they skipped a lot of the parts where I was just sitting there for hours." The Petitioner said that his counsel discussed "which parts of the tape to try to redact versus what to play," but the Petitioner was not "privy" to those discussions and made no decisions regarding which parts of the recording should be used at trial.

The Petitioner said the State did not disclose to the defense attorneys that Dr. Mileusnic, the medical examiner, would stage a reenactment until it occurred during trial. Counsel had interviewed Dr. Mileusnic prior to trial, but they did not tell the Petitioner that she had tested the rope the police had found at the residence. The Petitioner said that if the State had made another plea offer "[a]t the point of the trial," he would have accepted it.

The Petitioner said that appellate counsel represented him at the motion for new trial hearing and on appeal. The Petitioner met with appellate counsel three times while preparing for the appeal, and they discussed the issues to be raised.

On cross-examination, the Petitioner said that he fled the jurisdiction after learning that pretrial counsel was critically ill and "things did not look like the way [he] thought they should have worked out." The Petitioner's father had posted a property bond to get the Petitioner out of jail, and the Petitioner left the jurisdiction. The Petitioner was later taken into custody in Los Angeles, California. The Petitioner did not say how long he was gone. The Petitioner said that after his return, he and trial counsel met nightly while the Petitioner was in custody.

The Petitioner said that he was in custody the first time he was interviewed by Dr. McCoy. After he was released on bond, he met with her again before he fled to California. Dr. McCoy asked him a "wide variety" of questions dealing with his mental health. The Petitioner never met Dr. Blake.

The Petitioner said that neither he nor counsel were expecting the State to conduct a reenactment at trial. During Dr. Mileusnic's reenactment, the Petitioner told counsel he

had cut off a piece of the rope used in the suicide and tossed it into the ceiling. He did not tell the police or counsel about the piece of the rope because it "didn't even cross my mind. They had a thorough investigation at that house." The Petitioner said that the piece of rope he threw into the ceiling was the part he touched when he removed the victim's body from the strangulation device in her son's bedroom and that "you watch TV shows and things, talking about DNA and all this. That was where my involvement was."

The Petitioner said that he learned during a visit from appellate counsel that appellate counsel had failed to file his appeal to the Tennessee Supreme Court on time. Appellate counsel explained that he was sick and "was in Cincinnati or somewhere at a hospital." As a result, the Petitioner was unable to appeal his case to the supreme court.

On redirect examination, the Petitioner said that Dr. Blake died before the Petitioner's trial and that he and trial counsel did not discuss obtaining another forensic pathologist. The Petitioner thought that pretrial counsel had contacted Dr. Blake and that "the direction kind of changed" after pretrial counsel's death.

Christopher Robinson testified that he was a forensic consultant. Regarding his qualifications to testify as an expert, Robinson said that he had specific training in the use of ropes in strangulation as part of a five-week training session at the Henry Lee Institute. During the course, different methods of strangulation were discussed, including pulleys and how to determine by the suspension of the rope if the death was a suicide. Robinson also testified as an expert in crime scene reconstruction.

Robinson said that he was retained by the Petitioner as part of the post-conviction case. Robinson said that he looked at photographs of the crime scene but that he never visited the crime scene. Robinson examined the police reports, trial testimony, photographs, and trial exhibits, including a video reenactment by the police department. As part of his review, Robinson "examined the rope itself, the pulley. I measured the length of rope, the additional piece of rope that was recovered." Robinson said that the rope used during the State's reenactment at trial "was a black rope" and that the rope used to hang the victim "[w]as a yellow rope."

Robinson said that the type of rope used during the State's reenactment was a "diamond-braid, heavy-duty polypropylene rope" with a synthetic core. The rope used in the victim's death was a hollow-braid polypropylene rope. Robinson said that the State should have used the exact same type of rope that was used by the Petitioner. Robinson further said that the black rope used during the State's reenactment was sixteen inches shorter than the rope the Petitioner used.

Robinson said that if he had been retained by counsel prior to trial, he would have visited the crime scene and reviewed the materials he looked at in preparation for the post-conviction hearing. Robinson stated that he would have preferred to do his own reenactment using the same type of rope allegedly used during the offense and "using different lengths of rope, the 97 or then the additional 52 inches added." Robinson said that he would have reported his findings to counsel prior to trial.

Robinson said that the fifty-two-inch piece of rope found in the ceiling and the ninety-seven-inch rope initially found by the police "exhibit[ed] strong similarities to each other." He acknowledged that he examined the two pieces of rope with a magnifying glass, not a microscope. He said that if he had been employed for trial, he would have examined the ropes under a microscope.

On cross-examination, Robinson acknowledged that he did not know "definitively" that the ninety-seven-inch rope, if used in the pulley system, would have been sufficient to strangle the victim. Robinson further acknowledged that the Petitioner did not tell anyone about the piece of rope prior to trial and that a crime scene reconstructionist would not have known to factor the length of that piece of rope into the reenactment.

On redirect examination, Robinson said that if he had been hired for trial, he could have watched the trial and advised counsel about the problems with the State's reenactment.

Trial counsel testified that his father, pretrial counsel, originally was lead counsel on the Petitioner's case. Pretrial counsel died a few days after the Petitioner was located in Los Angeles and extradited back to Blount County. Thereafter, trial counsel assumed pretrial counsel's role in the Petitioner's case.

Trial counsel said that by the time he became involved in the Petitioner's case, Dr. Blake had become incapacitated by a medical condition, and trial counsel was unable to speak with him. Trial counsel spoke with Dr. McCoy on one occasion. Dr. McCoy had been retained by pretrial counsel and co-counsel. Trial counsel said that he understood that Dr. McCoy had indicated to pretrial counsel and co-counsel that her discussions with the Petitioner would impact her "ability to testify without incriminating him in some capacity." Trial counsel said that he "reached out to her after [he] got involved and just to put it bluntly she pretty much shut the door in [his] face, would not really even discuss the case with [him]." Trial counsel said that co-counsel and pretrial counsel met with Dr. Mileusnic before trial counsel became involved in the case. Based on his discussions with co-counsel, trial counsel formed the opinion that consultations with other pathologists or forensic experts was "probably not something we needed to focus on."

- 12 -

Trial counsel had limited conversations with the Petitioner about the possibility of a guilty plea. Trial counsel's understanding was that the State had offered a plea of second degree murder to pretrial counsel and co-counsel. Trial counsel said that the discussions "involve[d] a plea either up in the range or to a higher range and that [the Petitioner] was not interested in that." By the time trial counsel got involved in the case, the Petitioner's circumstances "had changed dramatically." Trial counsel reinitiated plea discussions with the prosecutor. The prosecutor spoke with the victim's family and learned they were not comfortable with any plea offer. Accordingly, plea negotiations ceased, and the case was set for trial.

Trial counsel said that the defense was surprised by the State's reenactment of the victim's suicide. He noted that the Petitioner had given a videotaped statement to the police that was approximately nine to ten hours long. The Petitioner took the police to the residence and showed the officers how he had assisted the victim in committing suicide. The defense theory was that it was not a murder, but it was an assisted suicide, and the defense showed that the victim had issues with depression.

Trial counsel said that Dr. Pamela Jones testified that the victim did not leave a suicide note and that notes were not found in the majority of suicides. Trial counsel said that he spent "countless evenings" at the jail with the Petitioner, preparing for the trial. Trial counsel explained that they had a lot of videotape to review. Additionally, trial counsel wanted to prepare the Petitioner because trial counsel thought the Petitioner wanted to testify and thought the Petitioner needed to testify. Trial counsel discussed with the Petitioner the "pros and cons" of testifying and not testifying.

Trial counsel said that the Petitioner explained how he "came up with" the device that assisted the victim with her suicide. Trial counsel thought the mechanism was "pretty complicated." Trial counsel did not think the length of the rope used during the victim's suicide was mentioned during his discussions with the Petitioner, and the Petitioner never mentioned a cut rope existed. Trial counsel said, "That was the surprise in this." Trial counsel stated that knowing about the piece of rope would have been helpful.

On cross-examination, trial counsel said that Dr. McCoy's role was essentially to perform a "psychological autopsy" of the victim, which required Dr. McCoy to examine the victim's medical records, pharmaceutical records, and any information about the victim's personality, so she could potentially testify about the victim's inclination toward suicide. Trial counsel said that testimony by an expert that the victim was inclined to commit suicide could have been important. However, Dr. McCoy decided not to participate in the case. Trial counsel said that co-counsel was primarily responsible for securing defense witnesses, and trial counsel did not know which experts co-counsel contacted.

- 13 -

Trial counsel thought that Dr. Blake had examined the autopsy report and the Petitioner's version of the victim's death and that Dr. Blake's testimony would have been that the Petitioner's version of events was not inconsistent with how the victim died. Trial counsel acknowledged that such testimony could have been helpful to the defense. Trial counsel thought the defense tried to secure another expert who would give the same testimony as Dr. Blake, but they were not successful.

Trial counsel said that the defense did not try to employ a crime scene reconstructionist. Trial counsel explained that the video of the Petitioner's reenactment, although it included the use of a different rope, was an "exact duplication" of the offense. Trial counsel acknowledged that the yellow rope used in the State's reenactment was a "kind of nylon ski rope" and that Dr. Mileusnic said it was too short to have caused the victim's death in the manner described by the Petitioner. Trial counsel said that Dr. Mileusnic's testimony "was the most damaging" to the Petitioner's case, that the defense had no advance warning of her testimony, and that "it was one of the main points of contention on appeal." Trial counsel said that if the defense had been given advance notice of Dr. Mileusnic's testimony, they could have employed a crime scene reconstructionist to independently test her opinion that the rope was too short.

Trial counsel said that whether the piece of rope found in the ceiling was cut from the rope the police found when the victim died was never determined. Trial counsel stated that the police found the yellow rope on the day of the victim's death, that the piece cut off of the rope was found in the ceiling where the Petitioner said it would be found, and that the piece in the ceiling was also yellow.

Trial counsel recalled that the ligature marks found on the victim's neck were horizontal. In his original statement to the authorities, the Petitioner said that he found the victim "in the garage basement hanging up and that he had let her down." Trial counsel thought the autopsy report revealed that the ligature marks "were more horizontal, not completely vertical, if you know what I'm saying, but conducive with someone hanging vertically from a rope or a noose." Trial counsel agreed that testimony from a medical expert such as Dr. Blake could have been important to establish how the victim received the ligature marks.

Trial counsel agreed that the State's reenactment influenced the jury and that expert testimony rebutting the reenactment could have made a difference. Trial counsel thought that the video of the Petitioner's statement to the police was redacted to remove the parts where "nothing was happening."

Trial counsel agreed that the ability to negotiate a plea was diminished after the Petitioner absconded. Trial counsel talked with the Petitioner about the consequences of his flight and the potential for a flight instruction at trial. Additionally, trial counsel filed a motion in limine to keep some of the details of the Petitioner's flight from the jury. Trial counsel agreed that he discussed the possibility of pleading guilty with the Petitioner and advised him "that because of the fact that he had fled that he was in some trouble and he might want to think about offering second degree." The Petitioner never gave any indication that he was interested in pleading guilty to second degree murder. Trial counsel further agreed that the State discussed the possibility of a guilty plea with the victim's family and learned that the victim's family was not comfortable with a plea agreement. Trial counsel thought the only possible option was for the Petitioner to plead guilty to the charged offense of first degree murder.

On redirect examination, trial counsel said that in its demonstration, "the State utilized the actual rope that was in evidence to demonstrate that it wasn't of sufficient length to accomplish what he had said." Trial counsel explained that "the gist of what [Dr. Mileusnic] was demonstrating is this rope is not long enough to do what [the Petitioner] demonstrated. And that's when [the Petitioner] revealed to us . . . there's another piece that's not here." Trial counsel explained that the black rope was used in the Petitioner's reenactment.

The post-conviction court found that the Petitioner failed to establish a claim for relief. On appeal, the Petitioner contends that trial counsel was ineffective by failing "to obtain adequate expert and investigative assistance and/or to present such testimony at trial"; by failing "to object to the introduction of improper, irrelevant, inflammatory and prejudicial evidence"; and by failing to adequately advise the Petitioner whether to accept or reject the State's plea offer.

## II. Analysis

To be successful in a claim for post-conviction relief, the Petitioner must prove the factual allegations contained in the post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings.

See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When the Petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the [P]etitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the Petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause [the P]etitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [Petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

On appeal, the Petitioner argues that his right to effective assistance of counsel was "violated by trial counsel's failure to obtain adequate expert and investigative assistance and/or to present such testimony at trial." Specifically, the Petitioner contends that counsel should have secured the services of a crime scene reconstructionist for consultation prior to trial and possibly to testify at trial. The Petitioner maintains that Robinson's testimony at the post-conviction hearing demonstrated that counsel's failure to hire a crime scene reconstructionist to counteract Dr. Mileusnic's testimony at trial "was a crucial failure in presenting an adequate defense." The State asserts that Robinson's "conclusions are based factual conclusions rebutted by the record and partially rely on a piece of evidence the trial judge ruled inadmissible. Thus, he could not have offered helpful testimony at trial like he did at the evidentiary hearing."

The Petitioner also contends that counsel should have retained a forensic pathologist to replace Dr. Blake and to combat Dr. Mileusnic's testimony. In his brief, the Petitioner acknowledges that trial counsel testified "that Dr. Blake's findings were that the autopsy results were consistent with [the Petitioner's] reenactment during the interrogation." The State notes that Dr. Blake died and that the defense was unable to secure a witness willing to give testimony similar to that which would have been offered by Dr. Blake.

The post-conviction court discredited the Petitioner's claims that counsel was deficient by failing to hire a crime scene reconstructionist or a forensic pathologist to aid in cross-examining Dr. Mileusnic. The post-conviction court noted that counsel hired Dr. Blake, Dr. McCoy, and Dr. Jones, who opined that not leaving a note was not uncommon for people who commit suicide. Dr. McCoy performed a psychological autopsy on the victim, but counsel decided not to use Dr. McCoy as a witness because her testimony incriminated the Petitioner. The post-conviction court noted trial counsel's explanations regarding his decision not to use the experts and found that trial counsel was not deficient. The record does not preponderate against the post-conviction court's findings.

The Petitioner contends that trial counsel should have objected to "the introduction of improper, irrelevant, inflammatory and prejudicial evidence." Specifically, the Petitioner alleges that during Detective Danny Wilburn's testimony at trial, he said that when he spoke to the Petitioner at the scene, the Petitioner "acted like he was crying, but there was no tears or anything like that," that the Petitioner "tried to break down emotionally and it just never did happen," and that Detective Wilburn and Deputy Porter agreed the Petitioner "was trying to cry, was our impression, and he never did cry." The Petitioner maintains that in the recording of his statement, which was introduced through Detective Wilburn's testimony, Detective "Wilburn and other officers involved in questioning ma[d]e hearsay statements, statements about the autopsy that they were not qualified to make, and highly prejudicial and irrelevant statements about [the Petitioner]." We note that the Petitioner did not raise this issue in his original or amended petitions or at the hearing; however, he raised the issue in his post-hearing brief in support of his petition for post-conviction relief.

In the written order, the post-conviction court found that detectives' testimony that the Petitioner "'seemed to be trying to muster a showing of emotion about the death of his wife but was unable to do so'" was relevant to whether the Petitioner was telling the truth about assisting the victim in committing suicide or whether he murdered her. The post-conviction court found that the evidence was admissible and that trial counsel's failure to object was not ineffective. The record does not preponderate against the post-conviction court's findings.

The Petitioner contends that counsel failed to "competently and adequately advise" the Petitioner whether to accept or reject the State's plea offer. The Petitioner maintains that pretrial counsel was ineffective when he failed to advise the Petitioner whether he should accept the State's plea offer of twenty years, especially given the strength of the State's case against the Petitioner. The Petitioner further complains that the pretrial counsel was also ineffective by failing to convey to the State the Petitioner's willingness to plead guilty in exchange for a fifteen-year sentence.

In its order, the post-conviction court rejected the Petitioner's claims that counsel failed to communicate all offers of settlement and failed to advise him whether to accept a plea offer or proceed to trial. The post-conviction court found that pretrial counsel advised the Petitioner of the State's offer of second degree murder with a twenty-year sentence and release eligibility after serving eighty-five percent of the sentence in confinement. The post-conviction court found that pretrial counsel properly advised the Petitioner that it was the Petitioner's decision whether to accept or reject the offer and that the Petitioner rejected the offer and said he would only accept a plea to manslaughter. The record does not preponderate against the findings of the trial court.

### III. Conclusion

Upon review, we affirm the judgment of the post-conviction court.

_____
NORMA MCGEE OGLE, JUDGE

- 18 -